IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 18-cv-03007-RBJ

ALISHA MARIE MAESTAS,

     Plaintiff,

v.

NANCY BERRYHILL, Acting Commissioner of Social Security,

     Defendant.

---

## ORDER

---

     This matter is before the Court on review of the Social Security Administration ("SSA") Commissioner's decision denying claimant Alisha Marie Maestas' (formerly known as Alisha Marie Gonzales Menjivar) application for supplemental security income ("SSI"). Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons explained below, the Court reverses the Commissioner's decision and remands the case for further consideration.

### STANDARD OF REVIEW

     A person is disabled within the meaning of the Social Security Act only if her physical and/or mental impairments preclude her from performing both her previous work and any other "substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2). To be disabling, a claimant's conditions must be so limiting as to preclude any substantial gainful work for at least twelve consecutive months. *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

     This appeal is based upon the administrative record and the parties' briefs. In reviewing a final SSA decision, the District Court examines the record and determines whether it contains

substantial evidence to support the decision and whether SSA applied correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). The District Court's determination of whether the ruling by the Administrative Law Judge ("ALJ") is supported by substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Reversal may be appropriate if the Commissioner applies an incorrect legal standard or fails to demonstrate that the correct legal standards have been followed. *Winfrey*, 92 F.3d at 1019.

## BACKGROUND

### A. <u>Factual Background</u>

Ms. Maestas was born on September 9th, 1986 and was 29 years old when she first applied for disability benefits. She has had a severe anxiety disorder since childhood and left school before finishing ninth grade. R. 44–45; 203. Though Ms. Maestas received some income delivering newspapers and cleaning houses, she has never been able to live independently, and has never sustained employment at levels SSA would consider "substantial gainful activity." R. 191–193. Ms. Maestas' medical history is extensive, and I do not attempt to document it all here. I provide only a brief summary of relevant events and diagnoses for the purposes of this opinion.

In November of 2012, Ms. Maestas began to experience severe dizziness. A CT scan, MRI, and echocardiogram showed no abnormalities. R. 434–39, 607. In 2013, she was diagnosed with sinus tachycardia. R. 610. In January of 2014, following an emergency room

visit, she saw cardiologist Dr. Barbara O'Brien Beck, complaining of shortness of breath, discomfort in her chest, and irregular pulse. R. 574–75. Dr. Beck concluded she had "inappropriate sinus tachycardia," bigeminy (abnormal heart rhythm), and premature ventricular contractions ("PVCs"). R. 562–64; 590; 557. She reported to the cardiologist increased anxiety during this time. R. 551–53. She was prescribed atenolol and discussed use of a continuous positive airway pressure machine ("CPAP") for sleep apnea. *Id*. In September of 2014 she returned to the cardiologist and reported improvement in her heart palpitations except at nighttime. The cardiologist suggested they would improve once Ms. Maestas started using the CPAP. R. 545–46. Ms. Maestas returned in June 2015, reporting continued irregular palpitations but improvement with use of the CPAP. R. 532–34.

In January of 2014, Ms. Maestas sought mental health treatment at Mental Health Center of Denver ("MHCD") for frequent panic attacks, anger issues, mood swings, changes in appetite, sleep difficulties, lethargy, self-harming behaviors, and passive suicidal ideation. R. 392–93. She was treated by Mr. Jason Turrett, MA., a clinical psychology student who was supervised by Kimberly Pfaff, Psy.D and David Hargrave, Psy.D. R. 279. Ms. Maestas was initially diagnosed with panic disorder with agoraphobia, an unspecified mood disorder, and post traumatic stress disorder. R. 309–19. She was prescribed Lorazepam, psychometric testing, and continued therapy sessions. R. 378–83.

After several missed appointments, she underwent a series of psychological tests. Her IQ testing showed that she was borderline in perceptual reasoning and working memory, but when these scores were demographically adjusted, they were considered average or low average. R. 281–83. Other tests concluded that she had moderate impairment in sustained attention and impulsivity, inability to adjust to changes in tasks demands, and demonstrated signs of

depression. R. 289. Her evaluators summarized their findings: "Alisha's anxiety, immaturity, and relatively low general cognitive functioning cause impairment in her judgment. At times her anxiety overtakes her, skewing her perception of reality. Additionally, she tries to account for everything to which she is exposed, which causes her to obsess and ruminate." R. 290. The summary continued to say that "Alisha appears to lack adequate psychological resources to cope with the demands that are imposed on her," and that "Alisha's depressed presentation and anxiety could be impacting her ability to sustain attention." R. 289. She was then diagnosed with post-traumatic stress disorder, panic disorder with agoraphobia, and a major depressive disorder. R. 291–292. She resumed treatment on a bi-monthly basis, with difficulty attending appointments due to her agoraphobia and anxiety. Her therapist noted that her anxiety prevented her "from addressing her medical needs appropriately." R. 328–29.

In June of 2014, she visited a neurologist, Dr. Aaron Haug, complaining of sudden balance disturbances, "spaceiness," and vision disturbances including light sensitivity and vertigo. R. 431. She was diagnosed with "balance difficulty," intractable migraines, and was suspected to have vestibular migraines and benign positional vertigo. R. 431–32. She was prescribed Topamax, vestibular training, and physical therapy to assist her with use of a cane. *Id*. When she returned in September 2014, she told the neurologist she had not started the Topamax because she was concerned about side effects. She reported an increase in headache frequency and the neurologist noted that she was mildly photophobic and experienced subjective dizziness. She was prescribed magnesium and riboflavins as "natural" alternatives to prescriptions, more physical therapy, and vestibular training. R. 428–429.

In March 2015, she returned to the neurologist with worsened symptoms, including more frequent and severe headaches, movement sensations, and vertigo. She had begun taking

Topamax shortly before the visit but had not noticed any changes. The neurologist noted that she stood solely with a cane, appeared unsteady, and could walk across a room without the cane with difficulty. She was diagnosed again with intractable migraines and balance difficulty, and prescribed Paxil. R. 425–26.

In April of 2015, Ms. Maestas saw Dr. Carol Foster for a second opinion. She was diagnosed with "rocking vertigo, a migraine variant" and obesity. R. 772. Dr. Foster noted that rocking vertigo can be caused by vestibular disorders. *Id.* Ms. Maestas was prescribed an increased Paxil dose and continuing use of a CPAP for sleep apnea. R. 773.

In May 2015 Ms. Maestas saw her primary care provider, Dr. Stephen Shepherd, and reported constant bodily pain, pain upon touch, difficulty dressing herself due to pain, stiffness, muscle pains, headaches, and light sensitivity. R. 470. She stated that she used the CPAP but woke up feeling as if she had not slept. *Id.* On exam she had a "slightly antalgic gait," rocked with standing, and had multiple tender spots on her thoracic and lumbar spine. R. 472. She was diagnosed with obesity, chronic headaches, and vestibular migraines with rocking vertigo. R. 468–73. She was also referred to a rheumatologist. R. 476.

In June of 2015 she returned to her original neurologist, Dr. Haug, and reported she had taken her lower-prescribed Paxil dose for two months. R. 423. She reported no improvement in vertigo, but less severe headaches. *Id.* She stood slowly with a cane, appeared unsteady, and had difficulty tandem walking but could cross the room without a cane. R. 423–424. She was told to increase her Paxil and restart Topamax. *Id.*

In July of 2015, she saw Dr. Duane Pearson, a rheumatologist who diagnosed her with fibromyalgia. R. 787–90. In August of 2015 she returned to Dr. Shepherd reporting shakiness, low food intake, and continuation of Paxil. R. 485. She was referred to the Mental Health

Center of Denver as well as to a bariatric and metabolic physician for treatment of her obesity. R. 503.

By December of 2015, after increasing her Paxil dose, Ms. Maestas developed concerns from things she had heard about the medication and discontinued it. R. 505. Her migraines had worsened in intensity and frequency, she continued to experience rocking vertigo and dizziness, and was told she had diabetes mellitus. *Id*. On examination by Dr. Haug, Ms. Maestas had a slight positional tremor in her hands, a steady gait without a cane, and was able to tandem walk only 5–6 steps with effort. R. 420–21. She was encouraged to restart Paxil and Topamax. *Id*. Dr. Haug would not complete disability paperwork. R. 421.

Dr. Shepherd did complete disability paperwork in January of 2016. R. 513–15. At this visit she had gained four pounds and reported inability to get out of bed due to depression and migraines. *Id*.

In March of 2016, Ms. Maestas underwent a consultative examination at Colorado Disability Determinate Services and was examined by James R. Baroffio, Psy.D. R. 619. The examination found that she had poor physical status, walked with effort, and needed a cane. R. 620. She also reported difficulty with household tasks due to her vestibular problems, as well as self-harm. R. 622–23. She presented "as depressive and anxious." R. 626. She was found to have a low to average memory, limited intellect, depressive disorder, generalized anxiety disorder, and somatic symptoms disorder. R. 620–628.

In July of 2016, Ms. Maestas saw an ear specialist, Dr. Robert Muckle, and described the November of 2012 onset of her headaches, imbalance, and intermittent oscillopsia. R. 630–32. The specialist found no hearing loss, noted she had normal gate, and ordered additional testing, concluding she had an unspecified disorder of vestibular function. *Id*. Based on additional tests

Ms. Maestas was diagnosed with Meniere's disease in the right ear and vertigo of central origin. R. 636–37. She was prescribed dyazide and recommended a low sodium diet. She reported improvement in her symptoms after two months on this medication and was referred for physical therapy. R. 641–42; 671.

Ms. Maestas' physical therapist found she had developed a maladaptive sensory referencing pattern over the last five years. R. 707. She demonstrated visual dependence with visual motion hypersensitivity and had a strong sense of motion at rest, which increased her anxiety. R. 706–07. Upon returning for continued physical therapy sessions, Ms. Maestas was unable to tolerate repositioning maneuvers and had strong sensitivity to positional change. Her physical therapist recommended ruling out benign positional vertigo. R. 703–04.

In February of 2017, Ms. Maestas resumed therapy at Mental Health Center of Denver. Her therapist noted that she rocked in her chair, moved her hands to cope with anxiety, had "fair" hygiene, and did not want to take medications. R. 698–99. Shortly after, she saw a medication prescriber who noted that she was prescribed lorazepam and sertraline for anxiety and agoraphobia but never took them out of fear. R. 687–90. The prescriber was concerned that her untreated panic disorder and anxiety would prevent her from committing to treatment. *Id*. To "proceed very cautiously with medications" until Ms. Maestas was ready to comply, he prescribed only Xanax, psychotherapy, and assistance with transportation. R. 689. In August of 2017, Ms. Maestas's blood tests showed "protein C and S deficiency." R. 712–19.

In December of 2017, Ms. Maestas started receiving home health care services. R. 35–40. Twice weekly, Ms. Maestas received assistance with bedmaking, meal preparation, dishwashing, cleaning, and other daily activities.

### B. **Procedural Background**

Ms. Maestas filed for Title XVI Social Security Income ("SSI") on November 23, 2015.

R. 184–190.  After the SSA denied her initial application on September 28, 2018, she requested a

hearing which was held before ALJ Scott A. Bryant on October 12, 2017.  R. 121, 41.  An

impartial vocational expert testified at the hearing, and Ms. Maestas was represented by counsel.

R. 41–68 (full hearing transcript).  The ALJ issued an unfavorable decision on February 9, 2018.

R. 12–29.  Ms. Maestas then asked the Appeals Council to review the decision.  Her request was

denied on September 28, 2018, making the ALJ decision final.  R. 1–6.

Ms. Maestas filed a timely complaint and petition for review in this Court on November

23, 2018.  ECF No. 1.  On March 4, 2019, she submitted an opening brief arguing that the ALJ

failed to properly evaluate her limitations, gave improper weight to medical and third-party

sources, and incorrectly assessed the consistency of her allegations.  ECF No. 15.  The

Commissioner responded to Ms. Maestas' brief, ECF No. 16, and Ms. Maestas filed a reply, ECF

No. 17.  This appeal is ripe for review.

### C. **The ALJ's Decision**

After evaluating the evidence of Ms. Maestas' alleged disability according the SSA's

standard five-step process, the ALJ issued an unfavorable decision.  R 12-29.  At step one, the

ALJ found that Ms. Maestas had not engaged in substantial gainful activity.  R. 18.  At step two,

the ALJ found that Ms. Maestas had the following severe impairments: recurrent arrhythmias;

migraines; obesity; affective anxiety; and somatoform disorders.  *Id*.  The ALJ found the

following non-severe impairments: chronic pain syndrome of unsure cause, Meniere's disease,

obstructive sleep apnea.  R. 18–19.  At step three, the ALJ determined that Ms. Maestas'

impairments did not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

At step four, the ALJ found that Ms. Maestas had a Residual Functional Capacity ("RFC") to perform light work as defined by 20 CFR 416.967(b), specifically she can lift and carry up to twenty pounds occasionally and ten pounds frequently, can stand or walk for six hours total, and can sit for six hours total in an eight-hour workday with normal breaks. R. 21. She can never climb ladders, ropes, or scaffolds, can occasionally balance, stoop, kneel, crouch, and crawl. She would require the use of a cane for distances greater than fifty feet. *Id.* Ms. Maestas can have no exposure to hazardous machinery or unprotected heights. She would be off-task an average of 5% of the workday and be absent from work one day per month to manage her medical conditions. *Id.* She is limited to simple, routine tasks. She can have occasional contact with supervisors, coworkers, and the public. *Id.*

In coming to this conclusion, the ALJ gave great weight to the opinion of psychological consultative examiner Dr. James R. Baroffio, who concluded that Ms. Maestas would have mild limitations in learning new tasks and interacting with others, and moderate limitations for complex tasks, and was not capable of managing funds. R. 25. The ALJ also assigned great weight to the opinion of Stacy Koutrakos, Psy.D., the state agency psychological consultant, who found that though Ms. Maestas had severe impairments of affective anxiety and somatoform disorders, she only had mild restriction in daily living activities and moderate difficulties in maintaining social functioning, concentration, persistence, or pace. *Id.*

The ALJ assigned little weight to the opinion of Dr. Stephen Shepherd, Ms. Maestas' treating provider who found that Ms. Maestas had limited ability to function in several mental abilities needed for unskilled work, with the most limitation in completing a workday without

interruption from psychologically-based symptoms and dealings with normal work stress. *Id*. The ALJ found Dr. Shepard's opinions to be inconsistent with Ms. Maestas' mental status examination findings of increasing eye contact, a congruent affect, demographically adjusted IQ score of 95, and her lack of participation in mental health treatment between June of 2015 and February of 2017. R. 26. Dr. Shepard also found that Ms. Maestas can sit for two hours total, stand or walk for less than two hours, must shift positions at will, can lift twenty pounds rarely and ten pounds occasionally, can rarely to occasionally perform postural activities, and would miss more than four days of work per month to manage her medical needs. *Id*. The ALJ found this opinion highly inconsistent with Ms. Maestas' comprehensive musculoskeletal examination, and numerous providers' opinions that Ms. Maestas had a "normal gait and station without the use of an assistive device." *Id*.

The ALJ assigned little weight to the opinion of Dr. Robert Muckle, Ms. Maestas' treating provider, who found that Ms. Maestas is not likely to be able to return to the workforce in the foreseeable future due to her chronic vestibular disorder with central vestibular issues and symptoms of dizziness, disequilibrium, and visual field instability. The ALJ found this opinion inconsistent with Dr. Muckle's own finding that Ms. Maestas has partially improved through her current treatment. *Id*. The ALJ also found the opinion inconsistent with Ms. Maestas' "abrupt stoppage of Paxil in 2015 despite reported improvement," as well as her "noted normal neuro-otologic functioning and normal gait and posture, normal Romberg, intact cranial nerves and 2+ deep tendon reflexes." *Id*.

The ALJ assigned little weight to the opinions of Dr. Carol Karshmer, the state agency medical consultant, who found the claimant had severe impairments of recurrent arrhythmias, migraines, obesity, and fibromyalgia. *Id*. Dr. Karshmer concluded Ms. Maestas had an RFC for

less than full range of sedentary exertional level work with postural limitations and must avoid hazards. *Id*. The ALJ found that the consultant's opinion directly contradicted her own findings that Ms. Maestas does not have a medically determinable impairment from fibromyalgia, that her heart palpitations are non-severe, and that the opinion relied on Ms. Maestas' self-reported symptoms. *Id*.

The ALJ found Ms. Maestas' Global Assessment of Functioning scores of very limited evidentiary value because they are subjectively assessed and reveal only a snapshot of Ms. Maestas behavior at the time of a particular evaluation. R. 27.

The ALJ assigned little weight to the opinions in Ms. Maestas' Third Party Function Report, completed by Ms. Maestas' mother Ruth Maestas, who reported that Ms. Maestas could walk only ten feet. *Id*. The ALJ found this opinion inconsistent with other providers' reports that Mr. Maestas had a normal gate and station without the use of an assistive device, as well as Ms. Maestas' own inconsistent reports of greater activity levels. *Id*.

At step five, the ALJ found that considering Ms. Maestas' age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. *Id*. Specifically, through the testimony of a vocational expert, the ALJ found that Ms. Maestas could perform the positions of routing clerk, office helper, and merchandise marker. R. 28.

Ms. Maestas asserts that the ALJ should have found at step two that Ms. Maestas' vestibular disorder and fibromyalgia were severe impairments and should have included limitations related to these disorders in calculating her RFC at step four. ECF No. 1 at 2. She also asserts that at step three, the ALJ should have considered the listings related to vestibular disorders. Finally, Ms. Maestas asserts the ALJ incorrectly weighted the opinions at step four.

Specifically, she argues that her treating source opinions should have been given controlling weight, and that the ALJ instead gave undue weight to the state agency sources who based their findings on incomplete evidence. She also asserts that the ALJ improperly rejected the third-party source opinion and incorrectly assessed the consistency of Ms. Maestas' allegations with medical evidence. ECF No. 1 at 3.

## ANAYLSIS

### A. Consistency of Plaintiff's Allegations with Medical Evidence

The ALJ found that Ms. Maestas' medically determinable impairments could be expected to cause her alleged symptoms, but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 24. Ms. Maestas objects to almost every finding of inconsistency by the ALJ. ECF No. 15 at 28–32.

Defendants argue generally that I "should not disturb" the ALJ's analysis, because the symptom analysis is "peculiarly the province of the finder of fact." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). Relying on this argument, defendants do not individually defend the ALJ's findings of inconsistency. This is a mistake, because I am obligated to determine whether the ALJ applied the correct legal standard and whether his findings are supported by substantial evidence. *Id.* (noting that judges "will not upset such determinations when supported by substantial evidence" and concluding that "some of the reasons advanced by the ALJ for finding plaintiff's subjective complaints of pain incredible were not supported by substantial evidence"); *see also Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). In examining these findings, I do not "reweigh" the evidence as suggested by defendants, but rather assess whether there is the ALJ's conclusions are reasonable under the relevant standard. ECF No. 16 at 18.

The ALJ first concluded that Ms. Maestas' reported limitations do not match her physical examinations and her providers' recommendations that she exercise. R. 24. ("Despite the claimant's obesity, she has had fairly normal physical examinations and providers have recommended more exercise."). It is unclear how a normal physical examination and recommendation of exercise would contradict any of Ms. Maestas' statements. The defendants have provided no explanation as to why this suggests an inconsistency. ECF No. 16 at 18. Thus, the finding that Ms. Maestas' reported restrictions due to obesity are inconsistent with a normal physical exam and provider recommendations to exercise was not based on substantial evidence.

The ALJ also noted that though Ms. Maestas has recurrent arrythmias, she also "reported having months where she is symptom-free, only rare palpitations recently, had an ejection fraction of 60%, a normal chest x-ray, and examination of the heart has been normal." R. 24. Because this evidence does suggest that Ms. Maestas' symptoms may have abated, it goes to the *persistence* of her limitations. In this regard, the finding was supported by substantial evidence. However, temporary abatement of her symptoms does not undermine the *severity* of her reported symptoms when they do occur. Again, defendants have provided no justification for the ALJ's finding that this reflects inconsistency with Ms. Maestas' account of her limitations. ECF No. 16. Further, the ALJ himself concluded that Ms. Maestas' recurrent arrythmias constitute a severe impairment, consistent with Ms. Maestas' reported symptoms. R. 18. Any finding that this evidence is inconsistent with the reported severity of Ms. Maestas' symptoms is unsupported by substantial evidence.

The ALJ suggested that Ms. Maestas' reported migraine symptoms are inconsistent with the fact that they were treated "only with Topamax and Paxil," and that she "abruptly stopped taking the latter despite reporting improvement with it." R. 24. Ms. Maestas argues there is no

substantial evidence that she experienced improvement, but rather only an anomalous instance in which she reported improvement on Paxil. ECF No. 15 at 29. Defendants respond that multiple records show that she experienced improvement. ECF No. 16 at 18. When there is evidence on both sides, I may not "displace the agenc[y's] choice between two fairly conflicting views." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). So, I uphold the ALJ's finding of substantial evidence that Ms. Maestas' reported migraine symptoms were inconsistent with other evidence.

The ALJ cited Ms. Maestas lack of motivation for her physical therapy as inconsistent with her reported symptoms. R. 24. The ALJ does not explain what inconsistency this indicates. Neither do the defendants argue that this finding should be upheld. Further, as Ms. Maestas points out, lack of motivation is a symptom of depression, conforming with many of her reported symptoms. The finding that Ms. Maestas' reported symptoms are inconsistent with a lack of motivation in physical therapy is not supported by substantial evidence.

The ALJ found Ms. Maestas' physical examinations "highly inconsistent" with her reported ability to walk only a few feet, pointing out her normal neuro-otologic functioning, normal muscle tone, normal sensation, normal gait and posture, normal Romberg, intact cranial nerve, and normal reflexes. R. 24. Defendants argue Ms. Maestas' reported inability to walk is contradicted by a "bevy of evidence, including her consistently normal muscle tone, gait, and station." ECF No. 16 at 19. As Ms. Maestas points out, the ALJ does not appear to have accounted for the physical examinations that found abnormalities in neuro-otologic functioning, R. 634, abnormalities in sensory referencing patterns, R. 707, unsteady gait, difficulty with tandem walking, R. 424; R. 426, antalgic gait, R. 472, and her positive Romberg test, R. 424.

If this were the only contradictory evidence, I would have to defer to the ALJ's conclusion in light of the contradictory evidence. However, Ms. Maestas points out that the ALJ

completely failed to account for the impact of Ms. Maestas' vertigo on her ability to walk. ECF No. 17. Instead, the ALJ focused exclusively on her muscle and reflex functioning, and concluded they were inconsistent with her reported symptoms. Because the ALJ failed to account for this significant evidence, the finding that Ms. Maestas' reported symptoms are inconsistent with her physical examinations is not supported by substantial evidence. This conclusion also applies to the ALJ's finding regarding Ms. Maestas' mother's opinion, which the ALJ said was inconsistent with medical evidence because it reported Ms. Maestas' inability to walk more than ten feet. R. 27.

The ALJ also pointed out the long gap in Ms. Maestas' mental health treatment, which suggests that her mental health impairment was less severe than reported. R. 24. However, Ms. Maestas correctly points out that under Social Security Ruling 16-3p, the ALJ had an obligation to inquire into the reasons the claimant failed to comply with or seek treatment consistent with her alleged symptoms. SSR 16-3p ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."). Had the ALJ done so, Ms. Maestas might have told him that she did not attend treatments due to her well-documented agoraphobia and anxiety. In response to this argument, defendants cite a Tenth Circuit case from 2000, long preceding SSR 16-3p, which became binding on SSA in 2016. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). Additionally, *Qualls* is not directly applicable.[1] I conclude that the finding that Ms. Maestas' reported symptoms were inconsistent with the gap in her mental health treatment is not supported by substantial evidence.

---

[1] In *Qualls*, the plaintiff argued that the ALJ ignored that his failure to seek medical treatment was due to his indigence. But the ALJ specifically found that free medical care was available, and the plaintiff did not contest that finding. *Id*. The present case is distinguishable because, unlike in *Qualls*, Ms. Maestas

The ALJ also pointed out Ms. Maestas' score of 30/30 on the mini-mental status exam, suggesting her mental impairment is less severe than she reported. R. 24. Ms. Maestas correctly argues that normal mental examination findings in some areas do not negate abnormal findings in others. Ms. Maestas has pointed to numerous irregular mental exam findings. ECF No. 15 at 15–20. Defendants have not defended this finding and thus I conclude that is it unsupported by substantial evidence.

Finally, the ALJ cited mental status examinations finding that Ms. Maestas demonstrated "avoidant eye contact, an anxious mood, and a restrict affect, but otherwise normal orientation, cooperativeness, good memory, some preservative thoughts on her health, attention, a normal mood, a normal affect, linear thoughts, and adequate use of language and fund of knowledge." R. 24. Again, it is unclear how this demonstrates inconsistency with her reported symptoms. This examination demonstrates both normal and abnormal findings, and as defendants do not provide an explanation of how this finding was supported by substantial evidence, I must conclude that it was not.

## B. <u>Weight of Opinions</u>

Ms. Maestas argues that the ALJ failed to consider the opinions of Mr. Turrett, who administered psychological tests to Ms. Maestas. She also argues that the ALJ improperly weighted the opinion of her treating providers, Dr. Shepherd and Dr. Muckle, which she argues were entitled to controlling weight. She further argues that the ALJ should not have assigned great weight to the opinion of Stacy Koutrakos, Psy.D, because she based her opinion on an incomplete record. ECF No. 15 at 38–42.

---

maintains an unaddressed explanation for her failure to seek treatment, namely her agoraphobia and anxiety.

1.  <u>Opinions of Mr. Turrett</u>

In 2014, Ms. Maestas underwent a series of psychological tests at the Mental Health
Center of Denver at the request of her mental health providers.  She was examined by Mr.
Turrett, a clinical psychology student, who was supervised by Dr. Pfaff and Dr. Hargrave.  Mr.
Turrett compiled an extensive report on Ms. Maestas' performance.  R. 279–94.  Included in this
evaluation were concerns about Ms. Maestas' "difficulties with attention, forgetfulness,
concentration, and decisionmaking."  R. 290.  The assessments also showed she had borderline
perceptual reasoning, working memory, and low average verbal comprehension and processing
speed.  R. 281.  The examiner drew several conclusions, including that "Alisha appears to lack
adequate psychological resources to cope with the demands that are imposed on her," and that
"Alisha's depressed presentation and anxiety could be impacting her ability to sustain attention."
R. 289.  In addition to confirming her diagnosis of panic disorder with agoraphobia, the examiner
diagnosed Ms. Maestas with posttraumatic stress disorder and major depressive disorder.  R.
292.

Although an ALJ "is not required to discuss every piece of evidence," he must at least
"discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly
probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996); *see also
Frantz v. Astrue*, 509 F.3d 1299, 1303 (10th Cir. 2007).  The ALJ made no indication that he
considered this report or provided any reason for rejecting its findings.

Defendants argue that the ALJ need not have explicitly rejected this evidence because
Ms. Maestas has not shown what additional RFC limitations should have arisen from the
recommendations in this report.  I disagree.  As Ms. Maestas argues, this report directly

addresses Ms. Maestas ability to "perform activities within a set period of time," "remember work-like procedures," and "perform at a consistent pace without an unreasonable number or length of rest periods." ECF No. 17 at 9. The evaluation provides significant evidence of her difficulty paying attention and conforming to demands placed upon her, which would certainly impact the amount of time she would be off task during a given work day. R. 281–292. Given the value of the evidence to calculating the RFC, the ALJ needed at least a "minimal level of articulation" as to why he chose to reject it. *Clifton*, 79 F.3d at 1010 (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir.1984)).[2]

### 2. Treating Source Opinions

When calculating her RFC, the ALJ gave "little weight" to the opinions of two of Ms. Maestas' treating providers, Dr. Shepherd and Dr. Muckle. R. 25–26. Ms. Maestas argues this violates § 416.927(c) and the treating physician rule, which can entitle the opinion of a treating physician to "controlling weight," or at least deference. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).

In the Tenth Circuit, the opinion of a treating physician is entitled to controlling weight if it "'is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.'" *Knight ex rel. P.K. v. Colvin*, 756

---

[2] Defendants cite case law not applicable here. In *Bales v. Colvin*, the Tenth Circuit held that the ALJ was not required to consider a medical opinion because the plaintiff could not explain how those findings had any bearing on her functional limitations, making them irrelevant to her RFC. 576 F. App'x 792, 797 (10th Cir. 2014) (unpublished). Here, Ms. Maestas has made it quite clear how the evaluation's findings would be relevant to her RFC. Similarly, in *Fulton v. Colvin* the Tenth Circuit found that the ALJ did not have to consider a provider's prescription of antidepressants in response to plaintiff's complaints of depression and anxiety because the doctor did not give an opinion about plaintiff's functional limitations. 631 F. App'x 498, 501 (10th Cir. 2015). Here, the evaluation gives several opinions about and significant objective medical information regarding Ms. Maestas functional limitations. As Ms. Maestas noted, though the evaluation was not a formal "function-by-function analysis," it provided an objective and detailed basis for one. ECF No. 15 at 38.

F.3d 1171, 1176 (10th Cir. 2014) (quoting *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir.

2004)). "An ALJ may decline to give controlling weight to the opinion of a treating physician

where he articulates specific, legitimate reasons for his decision." *Raymond v. Astrue*, 621 F.3d

1269, 1272 (10th Cir. 2009) (internal quotations omitted).

     a.   <u>Dr. Shepherd's Psychological Opinion</u>

The ALJ characterized Dr. Shepherds psychological opinion of Ms. Maestas as follows:

> Dr. Shepherd opined that the claimant had no limitation to no useful ability to
> function in a number of mental abilities needed for unskilled work, with the most
> limitation in completing a workday without interruption from psychologically-
> based symptoms and dealing with normal work stress . . . . He also identified an
> inability to meet competitive standards in dealing with stress of semiskilled work,
> interacting with the general public, using public transportation, remembering
> work-like procedures, maintaining attention for two hours, working in
> coordination with others, performing at a consistent pace, and accepting
> instructions or criticism from supervisors. He found marked limitation in
> activities of daily living, moderate limitations in maintaining social functioning,
> marked limitation in maintaining concentration, persistence, or pace, and four or
> more episodes of decompensation. Dr. Shepherd explained that the claimant
> forgets quickly, does not follow through well, struggles with cleanliness, has poor
> interactions with coworkers, and has symptoms of flashbacks, nightmares, panic
> attacks, hopelessness, and avoiding of public places.

R. 25. To explain why he found Dr. Shepherd's opinion unconvincing and worth little weight,

the ALJ stated only "Dr. Shepherd's mental status examination findings of increasing eye

contact, a congruent affect, and a full scale IQ score of 95 with demographic adjustment. These

opinions are also inconsistent with claimant's mental health treatment, which the claimant did

not participate in June of 2015 to February of 2017." R. 26.

The ALJ has not presented a "legitimate reason" for discounting Dr. Shepherd's

psychological opinions. *Raymond*, 621 F.3d at 1272. The ALJ does not explain why Dr.

Shepherd's findings of increasing eye contact, affect, and Ms. Maestas' IQ call his other findings

into question. Further, he states that Dr. Shepherd's findings are inconsistent with her lack of

participation in mental health treatment, while I find them quite consistent. Dr. Shepherd's opinion notes that Ms. Maestas' symptoms include avoiding public places. Presumably this would include avoiding public places required to attend therapy sessions at MHCD. Ms. Maestas has been repeatedly diagnosed with panic disorder and agoraphobia, as well as severe anxiety, and has repeatedly expressed to providers the difficulty of attending appointments. R 291–292; 687–90.

That Dr. Shepherd relied in part on Ms. Maestas' subjective reports in drawing some of his conclusions does not provide reason to discount his opinion. For example, in *Knight ex rel. P.K.* the court concluded that though "subjective reports do not constitute 'medically acceptable clinical and laboratory diagnostic techniques' and can support giving a treating physician's opinion less than controlling weight," the subjective reports in question were "consistent and pervasive throughout the record," and "the ALJ did not expressly reject any of these reported behaviors or discuss how they failed to support" the treating physician's finding of impairment. 756 F.3d at 1177. "Although we may not second-guess an ALJ's credibility judgments, such judgment[s] by themselves do not carry the day and override the medical opinion of a treating physician that is supported by the record." *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (internal quotations omitted).

Defendants suggest that *Bean v. Chater* provides support for the ALJ's decision to discount Dr. Shepherd's opinion due to Ms. Maestas' inconsistent mental health treatment. 77 F.3d 1210 (10th Cir. 1995). In *Bean*, the Tenth Circuit affirmed the ALJ's consideration of the plaintiff's failure to seek treatment for her back and neck pain in the years following her accident. 77 F.3d at 1213. *Bean* is easily distinguished because in that case, the ALJ discounted

the credibility of the plaintiff's subjective complaints of disabling pain, rather than a treating physician's opinion. *Id.*

The ALJ provided no legitimate reason for affording little weight to Dr. Shepherd's opinion. Because the decision is deficient in its treatment of Dr. Shepherd's psychological opinion, I reverse and remand for a proper analysis. *Knight ex rel. P.K.*, 756 F.3d at 1177.

b. Dr. Shepherd's Physical Opinion

Dr. Shepherd also provided opinions on Ms. Maestas' physical limitations, which the ALJ assigned little weight. Dr. Shepherd concluded that Ms. Maestas can "sit for two hours total, stand or walk for less than two hours, must shift position at-will, can lift and carry twenty pounds rarely and ten pounds occasionally, can rarely to occasionally perform postural activities and would miss more than four days per month." R. 26.

The ALJ found this opinion inconsistent with Ms. Maestas failure to take

any medications for her migraines, and not having one in the last two months. [Dr. Shepherd's] [o]pinions are also highly inconsistent with the objective findings in the record of a comprehensive musculoskeletal examination without active synovitis or changes suggestive of a history of inflammatory arthritis and merely diffusely positive tenderpoints. Numerous providers have also noted that the claimant had a normal gait and station without use of an assistive device which supports [her] ability to stand and walk for more significant portion of the workday.

*Id.*

The ALJ has provided specific, legitimate reasons for assigning little weight to some of Dr. Shepherd's opinions. He cites inconsistencies between Dr. Shepherd's conclusions and other medical evidence regarding Ms. Maestas's ability to walk, stand, lift and carry weight, and perform postural activities. Because I do not weigh the evidence, but merely examine the record for substantial evidence in support of his decision, I affirm the ALJ's opinions here in part.

However, the ALJ's explanation provides no specific justification for his rejection of Dr. Shepherd's conclusion that Ms. Maestas would miss four days of work per month. As Ms. Maestas' treating provider, Dr. Shepherd seems well positioned to determine how many days Ms. Maestas generally requires to manage her conditions. In finding that this opinion deserved little weight, and later concluding that Ms. Maestas would only miss one day per month, the ALJ was obligated to provide a specific and legitimate reason for discounting Dr. Shepherd's conclusion on this issue. Because this decision is deficient in its treatment of Dr. Shepherd's opinion regarding Ms. Maestas's need to miss work, I reverse and remand for proper analysis.

      c.   <u>Dr. Muckle's Opinion</u>

Dr. Muckle, another of Ms. Maestas' treating providers, provided an opinion that Ms. Maestas "is not likely to be able to return to the workforce in the foreseeable future" due to her chronic vestibular disorder and related impairments. R. 768. The ALJ afforded little weight to this opinion because Dr. Muckle also reported that Ms. Maestas had partially improved, had stopped taking Paxil in 2015 despite reported improvement, and had normal neuro-otologic functioning, normal gait and posture, normal Romberg, intact cranial nerves and normal tendon reflexes. R. 630–634. He also rejected Dr. Muckle's conclusion that Ms. Maestas could not return to the workforce because "a statement by a medical source that the claimant is 'disabled' or 'unable to work' does not direct a finding of disability, nor does the undersigned give any special significance to the source of an opinion on an issue reserved to the commissioner." R. 26.

The ALJ is correct that under § 416.927(d), "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." This provides support for the ALJ's rejection of Dr. Muckle's opinion on Ms. Maestas' ability to

work.  Further, the ALJ provided specific and legitimate reasons it found the rest of Dr. Muckle's opinion inconsistent with the record.

### 3.  Opinion of Stacy Koutrakos

Stacy Koutrakos, the state agency's psychological consultant, provided an opinion that Ms. Maestas had severe impairments of "affective, anxiety, and somatoform disorders" causing "mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation."  R. 25.

The ALJ assigned great weight to these opinions.  *Id.*  Ms. Maestas argues this was inappropriate because Ms. Koutrakos rendered her opinion based on incomplete evidence. Specifically, Ms. Maestas claimed that Ms. Koutrakos did not review the evaluation prepared by Mr. Turrett following Ms. Maestas' tests at the Mental Health Center of Denver.  Additionally, Ms. Koutrakos performed her review in 2016 and was therefore unable to review evidence from 2017, rendering the basis for her opinion "stale."  ECF No. 15 at 41.

An opinion is not rendered stale solely because it is based on information that did not exist at the time it was rendered.  *Tarpley v. Colvin*, 601 F. App'x 641, 644 (10th Cir. 2015) (finding the ALJ properly afforded great weight to the non-treating agency physician's opinion, though the opinion did not rely on subsequent medical records).  Here the ALJ specifically noted the consistency of Ms. Koutrakos' opinion with "the claimant's treatment since the opinion was provided."  R. 25.  Though I "can imagine a factfinder reaching a different view about how much weight" to give Ms. Koutrakos assessment, on this record I "cannot say this factfinder lacked for evidence in reaching the decision he did."  *Tarpley*, 601 F. App'x at 644.

**C.** **ALJ Improperly Assessed Ms. Maestas' Meniere's Disease**

Ms. Maestas argues that the ALJ improperly assessed her Meniere's disease at step two in failing to identify it as a severe impairment. She also argues that he should have found that her Meniere's met or medically equaled a listing at step three. Finally, she argues he improperly accounted for the limitations imposed by the condition when calculating her RFC. ECF No. 15 at 32–37.

1. Step Two Assessment of Severity

An impairment "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 416.921. "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.922(a). It appears that the ALJ found Ms. Maestas' Meniere's disease was not severe because "treatment for the condition has consisted of only a low sodium diet and a referral for physical therapy." R. 18. Ms. Maestas argues that this is incorrect. ECF No. 15 at 33–34. In response, defendants argue that the ALJ considered this condition in the finding that her migraines constituted a severe limitation and when formulating the RFC, such that any mistake at step two was harmless error. ECF No. 16 at 13.

Ms. Maestas is correct that the ALJ relied on an incorrect statement of her treatment. When she was diagnosed with Meniere's by Dr. Muckle, she was prescribed dyazide, in addition to the above-mentioned low sodium diet and physical therapy referral. R. 637. Additionally, before she was diagnosed with Meniere's, in response to the symptoms that eventually led to her diagnosis, she was prescribed Paxil, topiramate, magnesium, and riboflavin. R. 421, 425–26, 429. Defendants do not contest that the ALJ incorrectly identified the treatment. Because the ALJ based his finding that her Meniere's was not a severe impairment solely on an incorrect

statement of her prescribed treatment, I must conclude that the finding was not supported by substantial evidence.

Defendants argue that despite this error, the ALJ sufficiently considered the severity of the Meniere's disease when determining the severity of Ms. Maestas' migraines. They note that vestibular migraines and Meniere's disease have the same symptoms, namely dizziness and balance issues. ECF No. 16 at 13. From this, they conclude that the ALJ's error was harmless because he determined her migraines to be severe. Defendant's somewhat tortured reasoning cannot bely the fact that at step two, the ALJ explicitly considered the conditions separately and made a flawed factual finding regarding the Meniere's. Defendants cannot cure an agency decision through post-hoc rationalization. *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

Defendants next argue that the ALJ accounted for her Meniere's disease symptoms at step four, when considering the limitations imposed by her migraines and therefore the step two error is harmless. Defendants are correct, that the ALJ indicates he will do this. R. 18. Though the ALJ considered limitations Ms. Maestas experiences due to her migraines, he did not consider dizziness, one of the primary symptoms of her Meniere's, and how this would affect her RFC. *See* R. 21–27. For this reason, the error at step two was not harmless.

2. Step Three Finding that a Listing was Not Met or Medically Equaled

The claimant bears the burden of showing that the impairment meets or medically equals a listing. 20 C.F.R. § 404.1520. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). An impairment is "equivalent" to a listed impairment if there are medical findings "at least of equal medical significance to the required criteria." 20 C.F.R. § 416.926.

Both parties agree that Ms. Maestas' Meniere's disease did not meet the requirement of Listing 2.07 that she show "hearing loss established by audiometry." 20 C.F.R. pt. 404, subpt. P, app. 1, § 2.07. However, Ms. Maestas argues the ALJ failed to inquire whether her impairment medically equaled Listing 2.07. ECF No.15. She also argues that when taken together with impairments caused by her severe anxiety and agoraphobia, her Meniere's medically equals Listing 2.07. *Id.*

Defendants correctly point out that "the collective medical findings of the combined impairments must be matched to the specific set of symptoms, signs, and laboratory findings of the listed impairment to which they can be most closely related. The mere accumulation of a number of impairments will not establish medical equivalency." SSR 86-8 (S.S.A. 1986). Ms. Maestas has not shown how her anxiety and agoraphobia are "at least of equal medical significance to the required criteria." She therefore could not establish medical equivalency and the ALJ's failure to consider equivalency was harmless error.[3]

### 3. Step Four RFC Calculation

At step four, the ALJ must consider all impairments, severe or not, when calculating an RFC at step four. 20 C.F.R. §416.945(e) ("We will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity."). *See also Wells v. Colvin*, 727 F.3d 1061 (10th Cir. 2013). Ms. Maestas claims that the RFC determination did not include the limitations she experiences due to her Meniere's disease,

---

[3] This conclusion comports with *Noguchi v. Astrue*, which held that the "ALJ could not conclude the impairment does not equal a listing without basing that assessment on the opinion of a medical expert." 2012 WL 3397299, at *4 (D. Colo. Aug. 15, 2012). In *Noguchi*, in the face of "well-supported, uncontradicted medical expert testimony that a claimant's impairments equal a listing," the ALJ concluded the opposite, and was reversed. *Id.* Here, unlike in *Noguchi*, there are no medical opinions suggesting Ms. Maestas could meet the required criteria, supporting the ALJ's conclusion, that Ms. Maestas' impairments do not meet or medically equal a listing.

specifically her inability to attend work consistently, her inability to work a full day, and the likelihood that she would be off task at least 25% of a work day in order to deal with symptoms of this condition. ECF No. 15. These limitations were attested to by her treating provider, Dr. Shepherd. R. 302–306.

Defendants argue that the RFC calculation was correct because the ALJ stated in step two that "to the extent that the claimant has symptoms related to [Meniere's] specifically, they are considered below with respect to her migraine condition." R. 18. Defendants argue this sentence means the ALJ sufficiently accounted for Ms. Maestas' impairment from her Meniere's in calculating the RFC.

The ALJ's RFC calculation deserves deference. However, as discussed above, the ALJ improperly discounted Ms. Maestas' self-reporting about the limiting effects of her conditions. The ALJ also improperly weighted treating source opinions. Relevant here is Dr. Shepherd's opinion regarding the amount of work she would need to miss due to her conditions. He also improperly discounted Ms. Maestas' self-reported limitations. These errors led the ALJ to ignore some of the limitations imposed by Ms. Maestas' Meniere's disease. Because of these errors, the RFC calculation itself was in error.

### D. The ALJ Improperly Assessed Ms. Maestas' Fibromyalgia

Ms. Maestas argues that, like her Meniere's disease, the ALJ failed to appropriately consider her Fibromyalgia at steps two, three, and four. ECF No. 15 at 37. Ms. Maestas argues that at step two, the ALJ failed to comply with Social Security Ruling 12-2p in evaluating her fibromyalgia. ECF No. 15 at 37.

SSR 12-2p requires that an ALJ find that a person "has an MDI [medically determinably impairment] of FM [fibromyalgia] if the physician diagnosed FM," and "the physician's

diagnosis is not inconsistent with the other evidence in the person's case record." There must also be evidence of "a history of widespread pain" and either "at least 11 positive tender points" in certain locations found bilaterally, and "evidence that other disorders that could cause the symptoms or signs were excluded" or "repeated manifestations" of fibromyalgia symptoms and "evidence that other disorders that could cause these repeated manifestations" were excluded. *Id*.

Ms. Maestas has not provided any evidence that she is able to meet either set of criteria. Ms. Maestas was diagnosed with fibromyalgia by a physician. R. 787–90. At the time, the only symptom her physician reported was diffuse pain and tenderpoints. R. 787; 789. She has not alleged, and from the record I cannot find, that she meets the other requirements of SSR 12-2p. Though providers have previously identified "diffuse tender points," there is no evidence she meets the required number nor specific locations. No evidence has been presented of repeated manifestations of other fibromyalgia symptoms. Neither is there evidence that her other disorders that could cause these symptoms were excluded. For these reasons, I find that the ALJ did not err in concluding Ms. Maestas fibromyalgia was not a medically determinable impairment under SSR 12-2p. Because there was no error at step two, the ALJ's failure to consider fibromyalgia as an impairment at steps three and four were not in error.

**ORDER**

For the reasons described above, the Court REVERSES and REMANDS the Commissioner's decision denying Ms. Maestas' application for disability benefits and instructs the ALJ to reconsider his decision or provide further explanation in accordance with the dictates of this order.

DATED this 12th day of November, 2019.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge